602 N.W.2d 364 (1999)
Daniel L. WILLIAMS, Plaintiff-Appellee,
v.
JAMA, INC., a Michigan corporation, and J & M Dairy Company, a division of Jama, Inc., Defendants-Appellants.
Docket No. 111887, COA No. 201293.
Supreme Court of Michigan.
September 20, 1999.
On order of the Court, the application for leave to appeal from the March 17, 1998 decision of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the questions presented should be reviewed by this Court prior to the proceedings ordered by the Court of Appeals and any further subsequent review by the Court of Appeals.
CORRIGAN, J., dissents and states as follows:
I would grant defendants' application for leave to appeal to consider the reasons advanced persuasively in Judge MARKMAN's dissent (Docket No. 201293, decided 3/17/98). My review at this juncture suggests that the trial court appropriately granted summary disposition for defendant. Judge MARKMAN, in dissent, notes that plaintiff, a commercial purchaser of milking equipment, sued in tort for economic losses, claiming negligent servicing. He views the case as properly controlled by this Court's holding in Neibarger v. Universal Cooperatives, Inc., 439 Mich. 512, 486 N.W.2d 612 (1992). In Neibarger, this Court established standards for examining mixed dealings in goods and services. Courts were directed to identify "the overall thrust of the dealings between the parties to determine the character of the transaction." Id. at 535, 486 N.W.2d 612. Even where services are a substantial component of the contract, if the predominant character of the contract is one for a sale of goods, the UCC exclusive remedy provisions will control. Applying this test to the instant facts, Judge MARKMAN and the trial court concluded that the predominant character of the commercial contract was a sale of goods. In light of the trial court order and the persuasive dissent, I am persuaded to grant leave to appeal.
Since the Court of Appeals opinion was unpublished, I include as an appendix to this statement the dissenting opinion of Judge MARKMAN as an aid to the bench and bar.
WEAVER, C.J., concurs in the dissenting statement of CORRIGAN, J.

APPENDIX A

STATE OF MICHIGAN COURT OF APPEALS

DANIEL L. WILLIAMS,

Plaintiff-Appellant,

v

JAMA, INC., a Michigan corporation,

and J & M DAIRY COMPANY, a division of JAMA, INC.

Defendants-Appellees. 
UNPUBLISHED

No. 201293

Hillsdale Circuit Ct.

LC No. 95-025519-NZ
Before: Markey, P.J., and Bandstra and Markman, JJ.
MARKMAN, J. (dissenting).
I respectfully dissent. The majority would allow a commercial purchaser of goods to sue in tort for economic loss by claiming that the goods were serviced negligently, rather than requiring that such suit be pursued under the auspices of Article 2 of the UCC, which was intended to govern transactions in goods. I believe that this is contrary to the Supreme *365 Court's holding in Neibarger v. Universal Cooperatives, Inc., 439 Mich. 512, 486 N.W.2d 612 (1992), and therefore, would affirm the trial court's grant of summary disposition pursuant to MCR 2.116(C)(7).
In Neibarger, supra at 527-528, 486 N.W.2d 612, the Supreme Court held that "where a plaintiff seeks to recover for economic loss caused by a defective product purchased for commercial purposes, the exclusive remedy is provided by the UCC, including its statute of limitations." "Allegations of only economic loss do not implicate tort law concerns with product safety, but do implicate commercial law concerns with economic expectations." Sullivan Industries, Inc. v. Double Seal Glass Co., Inc., 192 Mich.App. 333, 344, 480 N.W.2d 623 (1991). Here, plaintiff purchased milking equipment from defendants for use on his commercial dairy farm in hopes of increasing milk production, and then claimed economic damages when problems arose with the equipment. These facts seem, in my judgment, to take place this case squarely within the confines of "transactions in goods," covered by the UCC.
However, plaintiff argues that the UCC does not apply to this case because he seeks to recover for damages caused by the inadequacy of the maintenance services provided, rather than for any defect in the goods, as would arise out of a "transaction in goods" under the UCC. The Supreme Court chose to examine mixed dealings in goods and services for "the overall thrust of the dealings between the parties to determine the character of the transaction." Neibarger, supra at 535, 486 N.W.2d 612. To illustrate this approach, the Court cited Republic Steel Corp. v. Pennsylvania Engineering Corp., 785 F.2d 174, 184 (C.A.7, 1986), which held that even the fact that "services were a substantial part of the contract was not sufficient to preclude application of the UCC" because "`the predominant character of the Agreement ... was that of a contract for the sale of goods....'" Neibarger, supra at 536, 486 N.W.2d 612. The Court recognized that "[i]t is difficult to imagine a commercial product which does not require some type of service" and stated that courts should "examine the purpose of the dealings between the parties. If the purchaser's ultimate goal is to acquire a product, the contract should be considered a transaction in goods, even though service is incidentally required." Id. at 536, 486 N.W.2d 612.
In an effort to analyze this case in a manner consistent with the direction of Neibarger, the following facts are instructive, in my judgment. First, plaintiff and defendants came together initially for the purpose of purchasing and selling, respectively, new milking equipment. Plaintiff was apparently very specific regarding the exact pieces of equipment he wanted, choosing a combination of new and used equipment as well as retaining certain parts of his old milking system. The parties signed a written contract for the equipment.
Second, an oral, "handshake" agreement was also entered into by the parties at the time the equipment was purchased. Such an agreement was the product of a routine notification by the defendant that they provided a yearly maintenance of the system. According to defendants, this service is a routine part of their customary "service after the sale," since dairy farmers generally are concerned that someone be available to maintain their milking equipment over the course of its life. Defendants generally limit their inspection to the equipment they sold to the customer. Further, there is no evidence that defendants provide service absent the underlying purchase of their goods. Defendants merely provided service in order to enhance sales of milking equipment and to maintain customer satisfaction with their product.
Finally, given the potentially unlimited term of the service agreement, the oral nature of the agreement suggests an informal *366 commitment by the parties with regard to service. In this case, the parties not only failed to commemorate their agreement in writing, but they failed to clarify any of the terms of service beyond the loose offer of yearly inspections.
Based upon these considerations, the service agreement, in my judgment, was not an independent or discrete contract, but rather a side agreement meant to complement the underlying contract for goods. It was entirely incidental to the purchase of goods a purchase that was the object of the parties' original dealings with one another.
The majority distinguishes the instant case from Neibarger on the basis of the "separate oral contract" entered into by the parties at the same time that the milking machine was sold and on the basis of plaintiff's claim of negligent service rather than faulty design or installation as claimed by the plaintiffs in Neibarger. However, I believe that the majority errs by focusing on the oral agreement in isolation and by overlooking the guidance of Neibarger. Although the majority seems to find plaintiff's claim of negligent service in this case to be distinguishable from Neibarger, the plaintiff in the companion case of Houghton v. AlfaLaval, Inc., 184 Mich.App. 731, 459 N.W.2d 42 (1990) similarly claimed negligence in the maintenance of a milking system. Neibarger, supra at 518, 486 N.W.2d 612. There, the Court determined that, regardless of this claim, the "heart of the complaints in these cases is the fact that the plaintiffs purchased products which proved inadequate for their purposes, causing them lost profits... compensable in a timely suit under the provisions of the UCC." Id. at 537, 486 N.W.2d 612.
More importantly, plaintiff here dealt with defendants first and foremost in order to purchase milking equipment. The primary purpose of the transactions was not service, which was essentially an afterthought to the purchase of the equipment.
While plaintiff was specific regarding the equipment he wanted, the agreement regarding service was indefinite. Length of inspections, repairs and prices were all left undecided until the actual service call. In Higgins v. Lauritzen, 209 Mich.App. 266, 270, 530 N.W.2d 171 (1995), this Court found that the parties' contract was predominantly one for services rather than goods in part because the contract did not specify the goods to be installed, the purpose of the contract was principally to install a system rather than to purchase a particular system to be installed and the parts did not become identified until they were actually installed.
Therefore, the overall thrust of the dealings between the parties here was the sale of the milking equipment. The maintenance was neither the basis upon which the parties came together in the first instance nor at the center of their course of dealings. In my judgment, it cannot be said that the "heart of the complaints" was the maintenance. Rather, the service agreement was an additional incentive for those who purchased their equipment from defendants; a side agreement to the purchase of the milking system. By holding that a commercial purchaser may sue in tort to avoid application of the UCC by contending that follow-up services were negligently performed, the majority would obscure the law in this area. Since there are relatively few sales of goods that would not involve these types of ancillary services, the majority view has the potential to significantly undermine the holding of Neibarger. I would find that the trial court appropriately granted summary disposition for defendants.